**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| IN THE MATTER OF THE PERSONAL RESTRAINT OF:<br><br>TRAYVON R. CAIL,<br><br>                                   Petitioner. | No.  80199-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

ANDRUS, A.C.J. — In this personal restraint petition, Trayvon Cail challenges the judgment and sentence entered upon his convictions for attempted murder in the first degree, murder in the first degree, and robbery in the first degree.  Cail asserts that his trial counsel was ineffective in (1) failing to secure a plea bargain, (2) advising him to waive a jury trial, (3) failing to properly investigate his case, and (4) failing to prepare him to testify.  Because Cail has not established that defense counsel provided constitutionally inadequate representation, we deny his personal restraint petition.

<u>FACTS</u>

Trayvon Cail, Myles Dorsey, and Dejon Reynolds grew up in the same neighborhood in South Central Los Angeles.  In late February 2013, the three men traveled from Los Angeles to Seattle in a van that had been rented by Cail's wife.  The purpose of the trip was to sell oxycodone pills.  Dorsey spent a considerable amount of

time in Seattle while growing up, and had family and friends in the area. After the sale was complete, Cail and Reynolds returned to Los Angeles to pick up some more pills while Dorsey stayed with his sister in Tacoma. A few days later, Cail and Reynolds came back to the Seattle area in an SUV rented by Cail's wife. Cail and Dorsey exchanged text messages regarding Dorsey's efforts to locate a buyer.

On March 9, 2013, Dorsey contacted his friend Jermaine Smith to ask if he wanted to buy some pills. The following day, Dorsey and Smith made plans for Smith to purchase 1500 oxycodone pills for $18 each. Smith asked Dorsey to meet him at his home in SeaTac that evening to conduct the transaction. Smith was aware that an unknown person was involved in the deal, but he was not worried because he trusted Dorsey. About a year earlier, Smith had purchased prescription pills through Dorsey without incident.

Around midnight, Dorsey sent a text message to Smith saying they had arrived, and Smith came out to greet them. Smith's friend David Fashaw was at Smith's house because the two had just played a basketball game with their adult league recreational team. Dorsey and Cail exited the car, while Reynolds remained in the driver's seat. They went inside Smith's house and talked for a few minutes. Fashaw, who was unaware of the planned drug deal, remained seated and did not participate in the conversation.

When Cail pulled a baggie of pills from his pocket, Smith said the pills were not the kind he wanted. Cail said "I'll be right back" and stepped outside. About a minute later, Cail returned and asked to see the money. As Smith pulled $10,000 from his coat pockets, Cail took out a gun and shot Fashaw and Smith in the head. Fashaw was killed,

but Smith survived. Smith heard someone say "Whatcha doing? Get the money" before Dorsey and Cail fled.

Around 2:30 am, Smith's girlfriend Ashley Langer found Smith on his kitchen floor, paralyzed but still able to communicate. She called 911 and tried to stop the bleeding. When the 911 operator asked who did it, Smith's voice could be heard in the background saying "Myles Dorsey." But when King County Sheriff's Office (KCSO) Detective Jason Houck arrived at the scene, Smith told him the shooter was "the dude with Myles Dorsey." Smith also told Langer he had been shot by Myles Dorsey's friend. Smith did not know Cail's name. Smith was transported to Harborview Medical Center, where he was hospitalized for a month.

On March 13, 2013, KCSO Detective Jake Pavlovich went to Harborview and presented Smith with a montage containing Dorsey's photograph and the photographs of five other men. Cail, who had not yet been identified as a suspect, was not included in the montage. Smith described the shooter as about 6 feet tall, with a moustache and an afro and wearing a black hoodie. Smith thought that two of the photographs could be the shooter, but he was not sure. Smith correctly identified Myles Dorsey in one of the photographs.

On March 15, 2013, Dorsey came forward to police and named Cail as the shooter and Reynolds as the driver. Dorsey said he was unaware that Cail had a firearm or that he intended to shoot or rob anyone. When Cail shot Smith and Fashaw without warning, Dorsey feared he would be shot next. In his rush to leave, Dorsey left behind two cell phones. After fleeing, Dorsey called a cab and left the area. Photographs from a surveillance camera inside the taxi showed Dorsey appearing distraught. Cell phone

3

records show that Cail attempted to call Dorsey six times in rapid succession shortly after the shooting but the calls went unanswered.

Cail was arrested in Los Angeles on March 20, 2013. Reynolds was arrested the following day. Cail admitted he drove to Seattle with Dorsey and Reynolds in a white minivan, returned alone to Los Angeles, and then drove back to Seattle with Reynolds in an SUV rented by his wife. However, he denied any involvement in a drug transaction or the shooting in Seattle.[1] A search of Cail's house revealed 9 mm ammunition, the same caliber used in the shooting. No fingerprints or DNA matching Cail's were found in Smith's house. Tire tracks in the area where Cail's car was allegedly parked were consistent with the car Cail's wife rented for the March trip to Seattle, but a forensic examiner could not conclusively state they were made by the same tires.

Meanwhile, on March 18, 2013, Detective Pavlovich returned to Harborview and showed Smith a six-photograph montage containing a photograph of Cail obtained from a driver's license issued three years earlier. Smith thought a couple of the other photographs might depict the shooter, but he was not sure. When shown Cail's photograph, Smith said "I don't think it was him." On March 28, 2013, Detective Pavlovich presented another six-photograph montage to Smith which included Cail's recent booking photo. This time, when shown Cail's photograph, Smith thought it "[c]ould be him; I'm not sure."

The State charged Cail with attempted murder in the first degree, murder in the first degree, and robbery in the first degree, all with firearms enhancements. Cail was

---

[1] Although the trial court ruled that Cail's interview statement was voluntary and admissible, the State elected not to present it at trial.

initially represented in the pretrial period by three public defenders. Cail then chose to retain John Crowley, who took over the case in January 2015.

The case was continued multiple times, partially because of the need to locate and interview witnesses. Dorsey proved difficult to locate throughout the pretrial period. Four days before trial began, the State obtained a material witness warrant to compel his trial testimony. Around the same time, Crowley retained an investigator who interviewed Dorsey, Smith, and Langer during trial.

Trial began on May 24, 2016. On May 31, 2016, Crowley informed the court that Cail wished to voluntarily waive his right to a jury trial. After conducting a colloquy on the record, the court accepted Cail's written waiver, and the case proceeded by bench trial.

Thirty-eight witnesses testified at trial, including Smith, Dorsey, and Langer. Smith and Dorsey both identified Cail as the shooter and testified regarding the details of the drug deal and subsequent events. Text messages between Cail and Dorsey and between Dorsey and Smith corroborated Smith and Dorsey's testimony regarding the events that led up to the shooting. Police testified regarding the subsequent investigation, including Smith's inability to conclusively identify Cail as the shooter via photographic montages prior to trial.

Monica Hawkins, a 21-year old single mother who had been visiting Cail in jail, testified that Cail asked her to provide perjured alibi testimony in exchange for cash. Hawkins said she stopped communicating with Cail because his family did not provide as much money as they had promised. The State obtained a material witness warrant to compel her testimony at trial.

Cail testified in his own defense. He admitted that he traveled to the Seattle area in a rental car in late February 2013, but claimed that the purpose of the trip was to sell marijuana seeds, not prescription pills. Cail stated that he sold the seeds with Dorsey's help, paid Dorsey and Reynolds out of the proceeds, and returned to Los Angeles with Reynolds to get more marijuana seeds. Cail then returned to Seattle and remained there from March 8 to March 11 to conduct another cannabis transaction. He claimed nothing out of the ordinary occurred during that trip and the text messages he exchanged with Dorsey on the night of the shooting had nothing to do with pills. When asked what he was doing at the time of the shooting, Cail claimed he was waiting to meet Dorsey in the parking lot of a strip club near Smith's house. He testified Dorsey did not show up or answer Cail's calls, so Cail gave up and returned to Los Angeles. Cail denied any role in the shootings.

On cross-examination, Cail admitted that he tried to bribe Hawkins to provide him with an alibi. When asked about a series of recorded jail calls suggesting that Cail had asked his brothers to prevent Dorsey from testifying at trial, Cail claimed that he did not remember doing so and insisted his conversations had been misinterpreted.

On July 8, 2016, the court convicted Cail as charged. The court expressly found that the testimony of the State's witnesses, including Smith and Dorsey, was credible whereas Cail's testimony was not credible. At sentencing, the court dismissed the robbery count and sentenced Cail to 240 months on count I and 320 months on count II, to be served consecutively, plus mandatory firearm enhancements of 60 months on both counts, for a total term of 680 months of confinement. The court specified that the evidence against Cail was "overwhelming" and that the crime was "cold and

premeditated." Cail, however, professed his innocence and blamed Crowley for his convictions. On direct appeal, this court affirmed Cail's convictions in an unpublished opinion. See State v. Cail, No. 75963-9-I, 2018 WL 1907514.

After his convictions, Cail filed a Washington State Bar Association grievance against Crowley asserting primarily that Crowley had a conflict of interest because he had previously represented Dorsey's brother. The bar association concluded that Crowley's representation did not create a conflict of interest and dismissed the grievance. A few months later, Crowley resigned in lieu of disbarment based on alleged misconduct in several other cases.

Cail then retained new counsel and filed this timely personal restraint petition alleging that Crowley provided ineffective assistance of counsel. In support of his petition, Cail attached (1) his own declaration, (2) a report from attorney expert Peter Mazzone, and (3) a report from identification expert Dr. Dan Reisberg.

## ANALYSIS

To successfully challenge a judgment and sentence by means of a personal restraint petition, a petitioner must establish either (1) actual and substantial prejudice arising from constitutional error, or (2) nonconstitutional error that inherently results in a "complete miscarriage of justice." In re Pers. Restraint of Cook, 114 Wn.2d 802, 813, 792 P.2d 506 (1990). If a personal restraint petitioner makes a successful ineffective assistance of counsel claim, he or she has necessarily met the burden to show actual and substantial prejudice. In re Pers. Restraint of Crace, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012).

Under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution, a defendant in a criminal proceeding is guaranteed the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 684-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To establish ineffective assistance of counsel, a defendant must demonstrate both (1) that counsel's representation fell below an objective standard of reasonableness and (2) resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). If a defendant fails to establish either element, the inquiry ends. State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances. In re Pers. Restraint of Davis, 152 Wn.2d 647, 673, 101 P.3d 1 (2004). A reviewing court "approaches an ineffective assistance of counsel argument with a strong presumption that counsel's representation was effective." Id. at 673. To rebut this presumption, the defendant has the burden to establish that there are no legitimate strategic or tactical reasons explaining counsel's performance. McFarland, 127 Wn.2d at 335-36.

Plea Negotiations

Cail first argues that Crowley provided ineffective assistance of counsel regarding plea negotiations and sentencing consequences. Specifically, in a declaration filed in support of his petition, Cail asserted as follows:

> Mr. Crowley never informed me of my potential sentencing exposure and possible maximum sentence if I . . . was convicted as charged. I also was

unaware of the existence of the firearm enhancements and had no idea that the enhancements would be mandatory and each one imposed consecutively if I was convicted. Had I known that I was facing a bare minimum of nearly 47 years of incarceration with a standard range of 563.25 months (47 years) to 710.75 months (59 years) and would likely be sentenced at the middle or top of the range if convicted at trial, I would have pushed harder to negotiate a plea resolution. Knowing what I know now— and what Mr. Crowley failed to advise me—I would have accepted a plea deal involving up to 360 months (30 years) of incarceration.

The right to effective assistance of counsel extends to the plea bargaining process. Lafler v. Cooper, 566 U.S. 156, 162, 132 S. Ct. 1376, 182 L. Ed.2d 398 (2012); State v. Estes, 188 Wn.2d 450, 463, 395 P.3d 1045 (2017). Effective assistance in plea bargaining includes "assisting the defendant in making an informed decision as to whether to plead guilty or to proceed to trial." Estes, 188 Wn.2d at 464 (quoting State v. A.N.J., 168 Wn.2d 91, 111, 225 P.3d 956 (2010). While there is no per se rule requiring defense counsel to pursue plea negotiations in every case, failure to do so may constitute ineffective assistance if the conduct falls below an objective standard of reasonableness. State v. Holm, 91 Wn. App. 429, 437, 957 P.2d 1278 (1998).

To establish prejudice in this context, "a defendant must show the outcome of the plea process would have been different with competent advice." Lafler, 566 U.S. at 163. More specifically, a defendant must establish

that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court, [ ] that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

Lafler, 556 U.S. at 164.

Cail asserts that In re Pers. Restraint of McCready, 100 Wn. App. 259, 996 P.2d 658 (2000) is dispositive, but that case is distinguishable. In McCready, the petitioner

9

was convicted of first degree assault with a firearm enhancement after rejecting the State's plea offer of second degree assault. 100 Wn. App. at 261. The petitioner claimed that he would have accepted the plea offer had he known that he faced a mandatory minimum 10-year sentence. 100 Wn. App. at 261. The McCready court concluded that the defense counsel's failure to advise him of the consequences of rejecting the plea offer constituted ineffective assistance of counsel. 100 Wn. App. at 262. But here, unlike in McCready, the State never offered Cail a plea deal.

In his reply brief, Cail relies on Estes for the proposition that the lack of a plea offer is irrelevant to the analysis. In Estes, the defendant proceeded to trial and was sentenced to life as a persistent offender. 188 Wn.2d at 456. The Estes court held that defense counsel was ineffective because he failed to research and properly advise the defendant of his possible sentencing repercussions during the plea bargaining process. 188 Wn.2d at 460-62. The court further held that the defendant was prejudiced—even though he declined to negotiate—because he lacked knowledge about a key matter in his case and the record showed the State's willingness to reach a different outcome. 188 Wn.2d at 465-66. Thus, there was a reasonable probability that the result of the proceeding would have been different but for counsel's performance. 188 Wn.2d at 466.

But here, unlike in Estes, there is no evidence indicating that Crowley lacked knowledge of Cail's potential sentencing consequences and no evidence that the State was willing to negotiate a different outcome. In light of the strength of the State's case, it is purely speculative to suppose that the results of the proceeding would have been different but for counsel's actions. This is particularly so given that the hypothetical plea offer Cail now claims he would have accepted is limited to no more than 30 years of

confinement.[2] Here, Cail's total standard range for count I (the attempted murder of Smith) plus the mandatory firearm enhancement was 263.25-330.75 months, and his total standard range for count II (the murder of Fashaw) plus the mandatory firearm enhancement was 300-380 months. Under RCW 9.94A.589(1)(b), both crimes, as serious violent offenses, must be served consecutively. Thus, in order for Cail to have obtained a plea offer in which the maximum sentence was 30 years of imprisonment, the State would have had to agree to let Cail plead guilty to a lesser offense. No such showing has been made here. See State v. Crawford, 159 Wn.2d 86, 100, 147 P.3d 1288 (2006) (holding that defendant did not prove prejudice where there was no evidence that the prosecutor would have allowed him to plead guilty to a lesser offense). Even if Crowley failed to sufficiently explain Cail's possible sentencing exposure, Cail has not established prejudice.

Jury Trial Waiver

Cail next argues that Crowley provided ineffective assistance by misleading him into waiving his constitutional right to a jury trial. In his declaration, Cail asserted that Crowley convinced him he would have a better chance at a bench trial because the judge, an Asian-American former civil rights attorney, would look more favorably on him than an all-white jury would. Cail's attorney expert Peter Mazzone opined that there was no legitimate tactical reason to waive a jury trial in an identification case where all 12 jurors would have to agree on Dorsey's credibility and also on Smith's in-court identification of Cail as the shooter in order to convict.

---

[2] The total standard range for count I plus the mandatory firearm enhancement was 263.25-330.75 months, and the total standard range for count II plus the mandatory firearm enhancement was 300-380 months.

11

A defendant may waive his right to a jury trial provided that the record shows the waiver was knowing, intelligent, and voluntary. State v. Pierce, 134 Wn. App. 763, 771, 142 P.3d 610 (2006). A written jury trial waiver "is strong evidence that the defendant validly waived the jury trial right." Pierce, 134 Wn. App. at 771. Because an extensive on-the-record colloquy is not required, "the right to a jury trial is easier to waive than other constitutional rights." State v. Benitez, 175 Wn. App. 116, 128-29, 302 P.3d 877 (2013). Waiver of the right to a jury trial can be a tactical decision. State v. Ashue, 145 Wn. App. 492, 506, 188 P.3d 522 (2008) (citing State v. Likakur, 26 Wn. App. 297, 303, 613 P.2d 156 (1980)). "Our Supreme Court has stated that whether the accused should waive his or her right to a trial by jury is 'within the area of judgment and trial strategy and as such rests exclusively in trial counsel.'" Ashue, 145 Wn. App. at 506 (quoting State v. Thomas, 71 Wn.2d 470, 471, 429 P.2d 231 (1967)).

The State contends that Crowley's advice to waive his right to a jury, although unusual in a murder case, was neither unreasonable nor prejudicial. Under the circumstances presented here, we agree. Crowley sought to undermine Smith's identification of Cail as the shooter by cross-examining him on the weaknesses in the photographic montage process. Crowley could have reasonably believed that a judge would be more receptive to technical arguments about the montage process than a jury. Moreover, Dorsey had still not appeared in Seattle after seven days of trial despite the material witness warrant. Cail had an incentive to forge ahead with a bench trial, hoping Dorsey would not appear. If Dorsey failed to do so, then the only evidence the State would have had to place Cail in Smith's house was Smith's ambiguous identification of Cail as the shooter. And it would not be unreasonable for trial counsel to advise a client

that jurors may harbor bias against an African-American man in a case of this nature. See State v. Berhe, 193 Wn.2d 647, 657, 444 P.3d 1172 (2019) (noting the "common and pervasive evil" of implicit and explicit racial bias among jurors). Cail has not overcome the presumption that Crowley's performance can be characterized as legitimate trial strategy or tactics.

Nor has Cail established prejudice. Cail faced a strong case. First, Dorsey and Smith both testified Cail was the shooter. Second, cell phone records and texts corroborated their testimony and significantly contradicted Cail's version of events. Cail admitted he was in Seattle and in close proximity to Smith's house on the night of the shooting. The car he rented matched the car eye witnesses saw in Smith's driveway that night. Third, Cail's attempts to bribe Hawkins into providing false alibi testimony and the jail phone calls in which he enlisted help to prevent Dorsey from appearing at trial damaged his credibility. Based on this overwhelming evidence, Cail has not shown a reasonable probability that a jury would have acquitted him.

Witness Identification

Cail next argues that Crowley's representation was deficient because he failed to consult with an identification expert to attack Smith's identification of Cail. To support this claim, Cail submitted the declaration Dr. Dan Reisberg, who opined that he could have assisted the defense by (1) calling into doubt Smith's in-court identification of Cail after failing to previously identify him in two different photographic montages, (2) rebutting the State's assertion that Smith's responses to the photographic montages carried little weight, and (3) to impugn the State's assertion that Smith's in-court identification was

reliable. Cail contends that such expert testimony would have changed the result of his case.

Generally, "the decision whether to call a witness is a matter of legitimate trial tactics and will not support a claim of ineffective assistance of counsel." State v. Maurice, 79 Wn. App. 544, 552, 903 P.2d 514 (1995). "[W]hen eyewitness identification is a key element of the State's case, the trial court has discretion to admit expert testimony on the subject to assist the jury in assessing its reliability." State v. Sanchez, 171 Wn. App. 518, 572-73, 288 P.3d 351 (2012) (citing State v. Cheatam, 150 Wn.2d 626, 649, 81 P.3d 830 (2003)).

Here, even assuming without deciding that Crowley's failure to hire an identification expert was deficient, Cail has not demonstrated prejudice because Dorsey, not Smith, was the key witness. Dorsey knew Cail personally. He testified that he had previously engaged in drug deals with Cail and that he and Cail had traveled to Seattle together for the purpose of selling drugs. Although Cail claimed he came to Seattle to sell marijuana seeds rather than pills, he admitted to coming to Seattle with Dorsey and being in contact with him during the trip.

Because Cail could not credibly claim that Dorsey misidentified him, his only option was to assert that Dorsey lied in order to protect himself or another unknown individual. However, Dorsey's testimony was corroborated by considerable circumstantial evidence, including witness testimony and cell phone records. And the court found that Dorsey's testimony was credible whereas Cail's was not.

Cail asserts that the 911 call transcript shows that Smith initially identified Dorsey as the shooter, then changed his story after police responded to the scene. But Smith

14

testified at trial that he named Dorsey during the 911 call because "[Dorsey] was the one that brought the guy there, so—I didn't know the other guy's name, so I just said, in case I died, I wanted people to know they need to go find Myles Dorsey."  And Langer and police witnesses testified that Smith consistently identified "Myles Dorsey's friend" as the shooter as he lay wounded waiting for medics to take him to the hospital.  Although Smith's in-court identification of Cail as the shooter aided the State's case by corroborating Dorsey's testimony, it was not critical.  And the record shows that Crowley thoroughly cross-examined Smith regarding his identification of Smith and alleged flaws in the photographic montage identification process, including some points similar to those recommended by Dr. Reisberg.  Thus, Cail has not shown that identification expert testimony would probably have changed the result of his trial.

Cail further argues that Crowley should have brought a motion to suppress Smith's in-court identification of Cail as the shooter.[3]  He contends that Smith's description of the shooter was inconsistent with Cail's appearance and that the out-of-court montage procedures and Smith's in-court identification of Cail were overly suggestive.

Failure to bring a motion to suppress is not per se deficient performance. McFarland, 127 Wn.2d 322 at 336.  To establish prejudice, a defendant must show that a motion to suppress would likely have been granted. Id. at 333-34.  An impermissibly suggestive identification procedure violates due process if it creates a substantial likelihood of irreparable misidentification.  State v. Vickers, 148 Wn.2d 91, 118, 59 P.3d 58 (2002).  Here, even if we assume without deciding that the court would have granted

---

[3] Although Dr. Reisberg's report criticizes the montage identification process, Cail acknowledges that the montages were useful to his defense, and does not appear to argue that Crowley should have moved to suppress them.

a motion to suppress Smith's in-court identification of Cail as the shooter, Cail has not shown prejudice. Smith's unequivocal testimony that Dorsey was not the shooter, and Smith's testimony otherwise corroborating Dorsey's version of events, would not have been suppressed in any event. Smith's testimony was corroborated by other witnesses, including Langer and police who responded to the scene. And the court found Dorsey's testimony credible. Thus, the result of the case would not have differed even if Smith's in-court identification was suppressed.

Witness Investigation and Preparation

Cail asserts that Crowley was ineffective for failing to interview key witnesses. He contends that Crowley's failure to investigate ultimately forced him to testify at trial without preparation.

Courts "can certainly defer to a trial lawyer's decision against calling witnesses if that lawyer investigated the case and made an informed and reasonable decision against conducting a particular interview or calling a particular witness." State v. Jones, 183 Wn.2d 327, 340, 352 P.3d 776 (2015). "Failure to investigate or interview witnesses, or to properly inform the court of the substance of their testimony, is a recognized basis upon which a claim of ineffective assistance of counsel may rest." State v. Ray, 116 Wn.2d 531, 548, 806 P.2d 1220 (1991). However, "a defendant seeking relief under a 'failure to investigate' theory must show a reasonable likelihood that the investigation would have produced useful information not already known to defendant's trial counsel." Davis, 152 Wn.2d 647 at 739.

Cail contends that Crowley was ineffective for failing to locate and interview Dejon Reynolds. But as the State points out, Reynolds was a suspect and likely accomplice to

16

the crime and therefore had a Fifth Amendment right not to testify. Moreover, Cail offered no evidence as to what Reynolds' testimony might be. Without evidence as to what a witness would testify to, a defendant cannot establish that the result of his trial would be different if the witness had testified. See State v. Johnson, 180 Wn. App. 318, 325, 327 P.3d 704 (2014).

Cail also contends that Crowley was ineffective in failing to interview and call three of his family members for the purpose of impeaching Dorsey with testimony that he and Cail grew up together and were not merely acquaintances as Dorsey had claimed. However, given the limited probative value of such testimony and the opportunity for the State to elicit potentially damaging testimony on cross-examination, Cail has not shown that the failure to call these witnesses was deficient or prejudicial.

Cail further argues that Crowley should have located and interviewed his alleged alibi witness Monica Hawkins prior to trial, and that his failure to do so forced Cail to place her in the uncomfortable position of testifying against him at trial. But Cail does not explain how this would have changed the result of his trial, given that the State compelled her testimony against him as a material witness.

Finally, Cail asserts that Crowley was ineffective for failing to tell him that he would be called to testify and failing to prepare him to do so. The record does not support this assertion. In his opening statement, Crowley expressly informed the court that Cail would testify. Accordingly, his opening statement was built on facts that could be established only through Cail's testimony. Crowley made similar statements in open court in Cail's presence, five days before Cail was called to testify. Nor has Cail shown how better

17

witness coaching could have changed the outcome of the trial. Cail has not shown deficient performance or prejudice regarding witness investigation or preparation.

Cail asserts that relief is mandated given Crowley's many deficiencies and the resulting prejudice. But Cail has not met his burden to show that his counsel was constitutionally ineffective. His petition therefore must be dismissed.

_Andrus, A.C.J._

WE CONCUR:

_Mann, C.J._

_Verellen, J._